KANSAS CITY, M. & O. RY. CO. OF
TEXAS v. PYSHER. (No. 691.)

(Court of Civil Appeals of Texas. El Paso.
April 26, 1917. Rehearing Denied
June 7, 1917.)

1. RAILROADS ⬥══282(1) — INJURIES TO LI-
CENSEES—PLEADING—GENERAL DENIAL—EF-
FECT.

Where plaintiff, in a personal injury suit,
alleged that consignment was in defendant's
railroad car, and that it was negligent in failing
to have the car repaired, defendant's general
denial put in issue the ownership of the car, as
well as the negligence charged.

[Ed. Note.—For other cases, see Railroads,
Cent. Dig. § 910.]

2. RAILROADS ⬥══262 — INJURIES TO PERSONS
UNLOADING CARS — HIDDEN DEFECTS — IN-
SPECTION.

The ultimate carrier of the car, although it
made no inspection, was not liable for injuries
to consignee's servant, who, while unloading a
carload of automobiles, loaded by consignor in a
foreign car, was injured by a loose casting fall-
ing from over the door on the inside of the car;
the defect being one not discoverable by inspec-
tion of the outside of the car.

[Ed. Note.—For other cases, see Railroads,
Cent. Dig. §§ 831, 832.]

Appeal from Nolan County Court; Jno. H.
Cochran, Jr., Judge.

Suit by A. W. Pysher against the Kansas
City, Mexico & Orient Railway Company of
Texas. From a judgment for plaintiff, de-
fendant appeals. Reversed and rendered.

H. S. Garrett, of San Angelo, and Beall
& Douthit, of Sweetwater, for appellant.
Grisham & Grisham, of Sweetwater, for ap-
pellee.

WALTHALL, J. Appellee, A. W. Pysher,
brought this suit in the county court of Nolan
county against the Kansas City, Mexico &
Orient Railway Company of Texas to recov-
er damages for personal injuries alleged to
have been sustained, alleging that on or
about May 28, 1915, he had a consignment
of automobiles in a certain car belonging to
appellant, and that he was instructed by ap-
pellant's agent to open the door of the car
and receive the consignment; that upon open-
ing the car door a loose piece of casting,
which should have been securely fastened,
fell upon his head, causing the injuries of
which he complains. The particular negli-
gence assigned is as follows:

"That it was the duty of the defendant to
have its car repaired and to have the piece of
casting, which was loose and fell upon him and
inflicted his injury, safely and securely fastened,
but that defendant failed to do so, and that its
failure is negligence, and that plaintiff has suf-
fered the damages aforesaid because of said neg-
ligence."

Appellant answered by general demurrer,
general denial, and special denial of any neg-
ligence contributing to the injury, and al-
leged that the injury was caused by the neg-
ligence of appellee, in that he undertook to go
into said car and open the door and break
the seals thereon, and that if there were any

defects same were known, or in the exercise
of ordinary care should have been known, to
appellee, and that in failing to observe any
such defects and guard against them appellee
was guilty of negligence proximately caus-
ing his injury. By supplemental answer
appellee denied that he was guilty of negli-
gence, admits that he was injured while un-
dertaking to go into the car and while open-
ing the car door after breaking the seals
under the direction of appellant's agent, the
appellee having the said consignment there-
in, that he was not a car inspector, and could
not by the exercise of ordinary care have
known about the loose casting, and opened
the car door in the usual and customary man-
ner in which such doors are opened. The
case was submitted to the jury on a general
charge, and the jury found in appellee's fa-
vor and assessed damages. After the evi-
dence was heard appellant submitted to and
requested the court to give a peremptory
charge in its favor, and the court's refusal
to give said charge is made the basis of its
first assignment of error.

By the second assignment appellant insists
that the evidence is insufficient to sustain the
verdict and the judgment.

Appellant's contention under these assign-
ments is that the undisputed evidence showed
that the defect in the car, the loose cast-
ing, causing the injury, was one in a foreign
car loaded by the consignor at Detroit, Mich.,
under seals placed thereon by consignor, and
consigned to appellee's principal at Sweet-
water, Tex., and that said car had been
given the usual inspection when received by
appellant at Altus, Okl., and was under the
same seals, and that, in accordance with cus-
tom, the car was set to unloading platform to
be unloaded by consignee under the same
seals, that said seals were broken by con-
signee's agent acting with appellee in un-
loading the car, the delivery of the car be-
ing complete, and that the defect which caus-
ed the injury was a hidden defect concealed
on the inside of the car, not discoverable
by ordinary inspection for the running con-
dition of the car, and, no fact or circum-
stances being shown imposing upon appellant
any duty to inspect the inside of said car for
such hidden defect as to appellee, there is
no basis in the evidence for the submission of
any issues of negligence upon the part of
appellant.

In none of the pleadings was it alleged
that the car was a foreign car, and appel-
lee's counter proposition to this assignment
and proposition thereunder is that appellant
did not plead that the car was a foreign one,
nor that appellant did not know of the de-
fect in the car, and could not have known
by ordinary inspection; therefore there is no
basis for the assignment.

[1] Appellee, however, alleged that:

"Plaintiff had a consignment of automobiles
in a certain car belonging to the defendant, and

the negligence assigned'is its failure to have the car repaired and the loose casting, which was on the inside of the car, securely fastened."

This allegation had reference to the car in question. Appellant's general denial would be sufficient to put at issue the ownership of the car and a denial of the negligence assigned. If the car in question was owned by appellant and had been sent to the consignor to receive the consignment of automobiles, or if the appellant was instrumental in having the consignment loaded in the car, a different question would be presented, as in that case, where the defect was in the car itself, appellant might be charged with a knowledge of a defect in the car not observable from an ordinary inspection for transportation over its line of road. The undisputed evidence, however, shows that the car was a Missouri Pacific car, No. 80437, and was loaded out of Detroit, Mich., with Ford automobiles and sealed at Detroit, on both sides with the Ford Motor Company (the shipper's) seals, and consigned to the Adams Machine & Automobile Company, at Sweetwater, Tex., in whose employ appellee then was, and for whom he was working in opening and unloading the car at the time he was injured. While the record is not clear as to the initial railroad, we infer from the record that the shipment left Detroit over the Michigan Central Railroad, was later billed out of St. Louis, Mo., over the Missouri Pacific Railroad, and was received by appellant, as the ultimate carrier, at Altus, Okl., and by it transported to its destination at Sweetwater, and delivered to the consignee for unloading.

R. M. Adams, of the Adams Machine & Automobile Company, consignee, a witness for appellee, among other things, testified:

"I know the plaintiff. * * * He was working for me. * * * I was present when these cars were unloaded, and at that time I had paid the freight and all charges, and we had to open the car. We had no instruction from the agent or any one about opening the car. We had paid the bill of lading, and naturally I had permission to open the car. It was my custom after paying the freight charges to proceed to open the car, and on this occasion we went to the place where the car was and proceeded to open it. * * * I was at the car when the injury occurred, but I did not actually see the accident. * * * I examined the car and the iron that was supposed to have hit him. We had opened one door to the car, and he was inside the car shoving the other door open, and this piece of casting which was the top of the door came down on him. * * * This casting wasn't on the door exactly, it was at the top of the car where the door slides, and it should have been fastened by two bolts, two holes were there where the bolts had been, and they were missing, that is, one was gone. As well as I remember, the holes for the bolts were shattered, and so badly that one bolt couldn't hold. The wood looked rotten and shattered and was inadequate to hold the bolt. * * * When the door started back this iron fell from the inside of the car and hit him on the head. * * * It was not a part of the door; it was a fastening for the door. The piece that fell came from the inside of the car, and I don't think anybody could have seen it from the outside of the car."

Witness Zack C. Wilkinson, a witness for appellee, testified substantially as did Adams as to the opening of the car and the place from which the casting fell, and further said:

"That piece fell from the inside of the car; it fits on top of the door inside. I don't remember whether you could see that piece from the outside or not, but don't suppose you can because it fits up above the door on the inside; it fits up in a little crimp, I think, and when the doors are closed they are tight. I don't know but you might be able to see the edge of that iron from the outside of the car; I can't say about that."

Appellee testified in part:

"I had occasion to assist in unloading cars off the Orient Railway Company. It was a carload of Fords. Zack Wilkinson was assisting me in this. * * * We were pushing the door open, and this piece of casting fell from the top and hit me on the head. * * * I examined the place where the fastening was after I recovered. I found the fastening was made in an angle shape and is supposed to be fastened to the car by bolts. I made this examination after going to see the doctor on the same day of the accident. The wood part showed to have been broken for some time, seemed to be an old break, and there wasn't any bolts in one side; it was supposed to have two bolts, and wasn't any bolt in one side of it at all. * * * Zack Wilkinson and I started to push the door open from the inside, and while we were pushing the door the casting fell down from the top of the door near the center. The average door on an automobile car is reasonably close fitting."

C. W. Fooch, appellant's car inspector at Sweetwater, testified in part as follows:

"I have nothing to do with inspecting the inside of cars that come under seal. * * * My inspection is for the running condition of the cars. * * * I am familiar with this casting and where it is located. It is not observable from the outside of the car."

C. W. Sutton testified:

"I am car inspector. I live at Altus, Okl. * * * I held the position of car inspector for the Kansas City, Mexico & Orient Railway Company. On or about that time the Kansas City, Mexico & Orient Railway Company of Texas received a car marked M. P. 80437, or Missouri Pacific 80437. They received this car from the Kansas City, Mexico & Orient Railway Company at Altus, Okl. I inspected this car when it was received."

The above is all the evidence on the question of the location of the unfastened casting, the place from which it fell, and the possibility of discovering its unfastened condition by an ordinary inspection from the outside of the car. It seems evident that the defect of the loose casting over the car door could not have been discovered by an inspection from the outside of the car. The car was received by appellant for transportation at Altus, Okl., and was by it transported over its line of road to its destination at Sweetwater.

[2] The question presented to this court is: Was it the duty of appellant, the ultimate carrier of the car in question, to the consignee or the employés of the consignee, to make an inspection on the inside of the car for the defect in the car on the inside, where the defect could not be discovered by such an inspection as it was appellant's duty to make for the safety of its employés in

transporting the car over its line of road, and where there was nothing observable from the outside to indicate the defect in the car on the inside? The judgment of the court in this case has no support except upon the failure of the appellant to perform the duty, if it was its duty, to examine into the inside condition of the car to ascertain whether the casting over the door of the car, and a part of the car itself, was in a reasonably safe condition for unloading the car when delivered to the consignee. A somewhat similar question was presented in Gulf, W. T. & P. Ry. Co. v. Wittnebert, 101 Tex. 368, 108 S. W. 150, 14 L. R. A. (N. S.) 1227, 130 Am. St. Rep. 858, 16 Ann. Cas. 1153, a case relied upon by appellant, where Runge & Co. ordered a tank of Beaumont oil from McManus, Houk & Co., of Beaumont, which was loaded into a tank car that belonged to the Texas & New Orleans Railway Company, and was by the latter company and an intermediate carrier transported to Victoria and there delivered to the Gulf, West Texas & Pacific Railway Company, by which it was hauled to its destination for unloading by the consignee. Wittnebert had charge of the Runge & Co. gin, and with an assistant, undertook to unload the oil tank. The method of unloading the tank was to connect a piece of hose with the pipe that was connected with the reservoir, then to fasten the hose upon the end of an escape pipe which extended beneath the bottom of the tank by which the oil would pass through the hose into the pipe leading to the reservoir. It was necessary, before connecting the hose with the pipe, to remove the tap from the end of the escape pipe through which the oil would pass. Wittnebert and his assistant went under the car, and Wittnebert removed the tap, whereupon the oil flowed down from the tank upon him, inflicting the injury complained of. In the construction of the tank there was a valve which, when properly set, closed the upper end of the escape pipe and would prevent the flow of the oil through the escape pipe. The proper method of unloading the tank was, after removing the top and attaching the hose, to go upon top of the tank and raise the valve by means of a monkey wrench. When the car was placed upon the track for unloading the valve was not set, and when the tap was removed the oil flowed out upon Wittnebert. If the valve had been set as it should have been, this would not have happened. No one could tell whether the valve was set or not without going upon the car, removing the cap of the dome, and ascertaining the fact from the position of the rod. The car was inspected by the railroad company at Victoria, where the car was received by the last carrier, but the inspector did not go upon the top of the tank, nor remove the cap to ascertain whether or not the valve was set. The inspector could have ascertained the fact by removing the cap and examining the rod. The question presented was whether it was the duty of the Gulf, West Texas & Pacific Railway Company, the ultimate carrier, to see that the valve was set and the tank in a safe condition to be unloaded when delivered to the consignee. The Supreme Court held that under the facts of that case the extent of the duty of the ultimate carrier upon receiving the tank car was to make a reasonable inspection of its condition with reference to its fitness for transportation. The court distinguished that case from Sykes v. St. Louis & S. F. Ry. Co., 178 Mo. 693, 77 S. W. 723, in which it was said that:

"When a car is loaded for a through shipment, and must pass over one or more connecting roads before it finally comes into the possession of the ultimate carrier for delivery to the consignee, it is the duty of the ultimate carrier, before delivering it, to examine it and ascertain whether it is in such a state of repair that the servants of the consignee, while exercising reasonable care themselves, can enter upon it with reasonable safety for the purpose of unloading it; and, if it is not in such a condition, it is the duty of the railroad to make the necessary repairs, or to notify the consignee of the unsafe condition of the car, so that the consignee can warn his servants before they enter upon it."

The question before the court in the case from which the quotation is made was the liability of an intermediate carrier and not that of the ultimate carrier. That court held that under the same state of facts the intermediate carrier was not liable, while the ultimate carrier would be. In discussing the Gulf, W. T. & P. Ry. Co., Wittnebert Case, our Supreme Court said that the statement of the Supreme Court of Missouri in the Sykes Case, above quoted, was dicta, but distinguished that case from the Wittnebert Case, as the Sykes Case occurred through a defect in the car itself, while the Wittnebert Case occurred through a defect in the loading of the car. We can see no real difference in the principle underlying the duties of an ultimate railroad carrier in delivering a car to the consignee where the defect that causes the injury to the consignee or its employé is not the car itself or in the manner of loading it. We cannot see why the ultimate carrier should owe the duty to a consignee to break the seals of the shipper of a car and go inside and make an inspection of the car, where there is nothing on the outside of the car to indicate a defect in the car itself on the inside, or the manner of its loading from an inspection of the car for transportation. Certainly, a railroad company cannot be held liable to consignees or their servants except for its own negligence, or the negligence of preceding carriers of which it knows, or should know by ordinary inspection. We are of the impression that the good reasoning of the Missouri Supreme Court as to the extent of the duty of the intermediate carrier would apply alike to the ultimate carrier,

and that the duty of inspection of the inside of the sealed car rests with the consignee, as held by our Supreme Court in the Wittnebert Case, where the defect was in the loading of the car. It was held by the court in the Wittnebert Case to be a general rule that, when the consignor loads freight upon a car or packs articles for shipment, the carrier which receives the car as loaded, or the package as prepared, is not liable for damages which arise from the defect in the loading or the packing.

Appellee refers us to Railway v. Chambers, 17 Tex. Civ. App. 487, 43 S. W. 1090, as sustaining his second proposition that it is the duty of a railway to inspect a foreign car with the same care with which it should inspect its own cars. In that case Chambers was a brakeman of the carrier, and in descending from the top of a foreign car on a ladder composed of rounds screwed at each end to the side of the car was injured when the round of the ladder gave way, caused by the lag screw pulling out and the round parting from the side of the car, causing the brakeman to fall.

The car was sealed and was inspected by the appellant company, and the inspectors found nothing wrong with the car, but the inspectors did not climb its ladders, nor take hold of the rounds to see if they were loose. By climbing the ladders one could tell whether the ladders were loose when the defect would not appear to the sight. In that case the Court of Civil Appeals found from the undisputed evidence of appellant's own witnesses that, while the evidence tended to show that the defect was discoverable from the inside of the car only, the car was not inspected on the outside in an ordinarily careful manner, and that, if it had been, the defective fastening of the round in the ladder would, in all reasonable probability, have been discovered. Basing its conclusion of law on that finding, the court held that it was then the duty of the inspectors to go inside the car, if necessary, and see and know that the handholds were reasonably safe for use before the car was allowed to depart in the train. There is no doubt but that, when cars come to a railway company which have defects visible or discoverable by ordinary inspection, it must either remedy such defects or refuse to take such cars in its trains; so much, at least, is due to its employés. Railway v. Mackley, 157 U. S. 72, 15 Sup. Ct. 491, 39 L. Ed. 624. In that case the defect was on the outside of the car, and the court was discussing the duty the railroad owed to one of its employés then engaged in the movement of the car over its own line of road. But in this case appellee was not an employé of appellant, and the appellee's witnesses, after the defect is discovered, and after a full opportunity is offered to examine the defect in the car, make the fact to ap-

pear that the defect causing the injury could not have been seen from the outside of the car by an ordinary inspection for running purposes. The case is not in point. Railway v. Harris, 45 Tex. Civ. App. 542, 101 S. W. 506, referred to by appellee, is similar in its facts to the Chambers Case. The rule has often been announced in this and other jurisdictions that a railroad company is under the same obligation to furnish safe appliances for the use of its employés, whether the cars belong to it or to a connecting carrier, but that is not the question presented here, and we need not review the many cases referred to by appellee announcing that rule.

While the record shows that an inspection of the car was made at the point where appellant received the car, the evidence shows simply that an inspection was made, but the character or extent of the inspection made, or the result of the inspection as to whether the defect was discovered or discoverable, is not shown. However, in view of the rule announced in the Wittnebert Case that the duty of the appellant on receiving the car extended only to "a reasonable inspection of its condition with reference to its fitness for transportation," and in view of the evidence offered showing that the defect was not observable from the outside of the car, and the fact that the defect did not in any way affect the movement of the car, we are of the opinion that the peremptory instruction requested should have been given. The simple fact that appellant failed to inspect the car would not make appellant liable. It is the failure to inspect where an inspection would or should discover the defect.

For reasons stated, the case is reversed, and here rendered that appellee take nothing by his suit.

Reversed and rendered.