JOSEPHINE CROSBY, EXECUTRIX, v. FIRST PRESBYTERIAN CHURCH OF EL PASO.

Decided January 23, 1907.

**1.—Limitation—Permissive Possession—Boundary.**

Where it appeared from the evidence that it had been agreed between the plaintiff and the defendant that the defendant should continue to hold possession of land, then fenced and claimed by him, until at some time in the future the true line between the parties should be determined by them, and in the meantime the defendant was not to claim the benefit of limitation, defendant's possession was not hostile until the agreement was repudiated by him, or the true position of the line was ascertained.

**2.—Undisputed Testimony—Credibility—Question for Jury.**

Although the testimony upon an issue may not be directly contradicted, still when the interests of the witnesses and other circumstances cast suspicion on it, it is the right of a litigant to have a jury pass on the question.

**3.—Declarations of Decedent—Members of Corporation—Competent Witnesses.**

In a suit for land claimed by an incorporated church the members of such church are not disqualified by the statute from testifying as to declarations by and conversations with the defendant's testator.

Appeal from the District Court of El Paso County. Tried below before Hon. J. M. Goggin.

*Patterson, Buckler & Woodson,* for appellant.

*Turney & Burges* and *Manford E. Williams,* for appellee.—The evidence showing that the property in question was purchased by the church (appellee) from J. F. Crosby and the appellant, Josephine Crosby, and that before building his fence J. F. Crosby (husband of appellant)

agreed with the officers of the church, acting for it, that he would hold the land subject to the right and title of the church, no subsequent possession of appellant or her husband could be made the basis of a title by limitation, until the trust had been repudiated, and notice of the repudiation conveyed to the church. There having been offered no evidence that this agreement was not made, or that it had ever been repudiated, or that notice of the repudiation had ever been conveyed to appellee, the court properly directed a verdict in favor of appellee. Evans v. Berlocher, 83 Texas, 612; Texas & N. O. Ry. Co. v. Speights, 94 Texas, 350; Lachausen v. Laughter, 23 S. W. Rep., 513; Warren v. Frederichs, 83 Texas, 380; Chance v. Branch, 58 Texas, 490.

As neither Mr. A. G. Foster nor Mr. Walter Shelton is a party to this suit it was competent for them to testify as to statements made to them by J. F. Crosby concerning his possession of the land in controversy. Rev. Stats. of Texas (1895), art. 2302; Gilder v. City of Brenham, 67 Texas, 345; Bexar B. & L. Assn. v. Newman, 25 S. W. Rep., 461; Howard v. Galbraith, 30 S. W. Rep., 689; Lomax v. Marlow, 38 S. W. Rep., 228; Roberts v. Yarboro, 41 Texas, 449.

JAMES, CHIEF JUSTICE.—This was an action filed March 21, 1900, by the church, a body corporate, against Josiah F. Crosby and Josephine Crosby, in trespass to try title to certain land. Crosby's death after the institution of the suit was suggested, with allegation that he left a will duly probated by which he left his entire estate to his wife and co-defendant, who was made independent executrix, she qualifying as such, and she asked to prosecute the action individually and as executrix, which was allowed.

On May 2, 1905, she for herself and as executrix answered disclaiming all the land except a part thereof which was set forth; as to this she set up the statute of limitations of ten years, and also the plea of not guilty.

By supplemental petition plaintiff denied the allegations of adverse possession, and alleged that for several years prior to this action the homestead of defendants together with the disputed strip which belonged to plaintiff, were enclosed in common by Crosby under and with the express permission and consent of plaintiff and at its request and for its convenience, and defendants had never notified plaintiff or its agents that they claimed the ownership of said strip or that they repudiated the said license or permission under which they entered upon it, until a few days prior to the commencement of this suit, but on the contrary that said Josiah F. Crosby from time to time declared to plaintiff's agents and members that he was not claiming same as against a deed which he and his wife had executed to plaintiff's agent and trustee John A. Merrill on September 13, 1882, and that defendant's possession and that of her husband has never been adverse to plaintiff but of such a character as to lead plaintiff and its members to believe, as they in fact did believe, that the said Crosbys always recognized the right and title of plaintiff acquired under said deed until a few days before this action, when they for the first time stated to plaintiff its agents and members that they intended to hold it against plaintiff.

The first assignment is that the court erred in charging the jury that

the undisputed evidence showed that plaintiff was entitled to recover all the land sued for.

The uncontested facts appear to be that on September 13, 1882, J. F. Crosby and wife conveyed to J. A. Merrill as trustee for the church a strip of 19 feet width off a three acre tract known as the Crosby homestead. This strip adjoined the property of the church, and at that time Crosby had not built any homestead on said tract. About that time the church was erected, not covering, however, all the 19 feet strip. Crosby built about 1886, at which time he fenced his place so that it extended to the church and included the part of the 19 foot strip lying just west of the church. From that time on it was used as a part of the Crosby homestead, as a garden. There appears to be no question but that the user was such as would confer title by limitations, if adverse. The appellant contends that the testimony was such as necessitated the submission of that issue to the jury. It becomes necessary to examine some testimony in this regard. It is practically conceded by appellant that the instruction for a verdict was right unless what appears to have been the evidence of an arrangement between Crosby and those representing the church when he went into possession and built his fences in 1886, was such as prevented the operation of the statute in his favor. We shall state the evidence bearing on this feature of the case.

A. G. Foster testified that he had a conversation with Judge Crosby about the time the walls (brick fences) were built. The front wall was still green; that he was an officer of the Sunday School; that he asked Judge Crosby why he was putting the fence up, he said he had permission to build the fence, that it was better for the church to have the walls connect with the corners running out north and south and said we are going to take care of this property and we are going to have grass and trees growing in our yard, we will take care of the property for you. He said he was not going to make any claim for the property. · That he never had any other conversation with the judge until he went to see him about the extension of the church building, which was in 1899.

Mr. Foster's narration of the transaction in 1899 and that of others indicated that the conversation in 1886 was somewhat different from that above stated. To exhibit what the difference was we need only quote that of Mr. Foster, Mr. Merrill and Mr. Sheldon.

Mr. Foster testified that he was a member of a committee that went to see Judge Crosby in June, 1899. The committee was appointed by the church to go and see him and tell him that the church was going to tear down the fence and erect a building. Mr. Merrill and Mr. Sheldon were present, told Judge Crosby they were going to extend the church building and contemplated taking down the rear wall, and Judge Crosby said they were not to do it, that the property was not church property, but that the church was encroaching on his property, and claimed that he had not made a deed to the property. "I said there is a deed from you and your wife to this property, and he said there was not. He said we are claiming the property that comes within our deed. We own the property. It was deeded to us and we never deeded it away. We are claiming the property because it is our property. I asked the Judge if he did not remember the conversation. I said to him: Why, don't you remember

a conversation we had when you were about to put a fence up as to the facts that the line's not being determined there would be no claim for possession under the fence and that when we got ready to use the property we would find out where the lines were and that there would be no claim made, we were to act in a neighborly manner, and now we want to use the property we come to you for that purpose. The Judge said if we have deeded the property to you we make no claim to the property at all, you had better go up and talk with Mrs. Crosby. We went to see her and she said that the property was theirs, that it was under their deed and had never been conveyed away and the church by a mistake had gotten possession of some of their property; we told her we had a deed and she thought that was impossible. In the course of a day or two we got the deed and I don't remember who went back with me. I went to see the judge in his office and told him we had found the deed. He recognized the deed as that of himself and his wife and said: I had no recollection of signing that deed, and said I want you to talk this matter over with my wife, you come back and see me in a day or two. We told him that he had given the deed to the strip, the 19 feet, and that 'you make no claim of limitation as against that do you?' He said 'no.' We went up and talked to his wife and we went back about that time and he said they had talked the matter over and they had title by limitation and were going to hold it."

Mr. Merrill's account of this matter in 1899 was substantially that Mr. Foster stated, "that when the fence was built a little line of it extended from the sidewalk to the church building, that Judge Crosby complained of the boys in the Sunday school tearing it down by climbing on it. And that upon a remonstrance made to the church officials the question of line was discussed and it was agreed between them that the improvements should be respected until the facts should be ascertained and that neither party would claim possession by limitations in the meantime." That Judge Crosby said that he was making his claim to the land because the land was his and that he had never sold it and he had allowed the church to hold possession of more than they were entitled to, but if he had deeded the property he would not claim title by possession, and that Judge Crosby was afterwards shown the deed and saw that it had been signed by himself and wife and asked the witness and others to call again. On a subsequent visit he told us he intended to claim the land notwithstanding the deed; that he would have title to it by limitation and that he proposed to claim all that the law would allow him. This witness further testified that Crosby did not deny that when the fence had been put up it was agreed that the church would not molest his possession if he did not intend to claim it as against the church's title by their deeds.

Mr. Sheldon testified, as to the interviews in 1899, that he went to see Judge Crosby with Mr. Foster and Mr. Merrill. Mr. Foster mentioned about having a conversation with the Judge in reference to building fence about time it was built. The Judge said he was not claiming the land under the statute of limitations. He said our line should be east of the church. That we had made a mistake.

In view of the instructed verdict, we would have to give effect to that

version of the conversation between Mr. Foster and Judge Crosby which would appear to be the more favorable to appellant. Mr. Foster in one place testified that the conversation had in 1886 consisted of the unqualified statement by Crosby that he had permission to build the fence, and that he was going to take care of the property for the church, and was not going to claim it by limitation. The version of this interview as stated by Mr. Foster in the interview in 1899 was not the same. The understanding as outlined in the last interview was that Crosby claimed that the church was encroaching on his property, but as the lines had not been determined there would be no claim for possession under the fence, and that when the church got ready to use the property they were to find out where the lines were and that there would be no claim made. From Mr. Sheldon's testimony the agreement, as was stated by Mr. Foster to Judge Crosby on that occasion, was that it was agreed that the improvements should be respected, but that any claim to possession should remain unsettled until the facts as to the title should be ascertained, and that neither party would claim by limitation in the meantime.

The expressions by the witnesses were not conflicting in any material sense, being to the same effect, viz.: That Mr. Crosby was contending that the church's line did not take in the strip, but that it was his, and that the church was over upon his line, and it was agreed that he should retain possession of it, but would not claim it by possession until the title, that is to say, the line should be ascertained. It was undisputed that after that nothing whatever was done on either side, until the church wanted to extend its building which was in 1899.

We do not consider that it makes any difference that the line was readily ascertainable by measurement. Whether or not Crosby at that time had forgotten that he had made a deed to the 19 foot strip, or whether he arbitrarily took the position that the church was already upon his property, makes no difference. The testimony was that it was agreed that he should continue to hold it until at sometime in the future the status of the line should be arrived at by the parties, and in the meantime he was not to claim the benefit of limitation. That agreement, if made, fixed the status of his possession as not hostile, and that condition remained until 1899, when for the first time, according to the testimony, he asserted adverse claim. It is argued by appellant that no definite time was fixed by the agreement for its duration, and that after the lapse of a reasonable time, adverse possession would set in. We can not agree with this. The agreed possession would have continued until either party brought up the subject again, or the line was ascertained as between them, or until Crosby did some act repudiating the agreement. Mere lapse of time, of itself, would not affect the matter.

But was the court authorized to withdraw the case from the jury? The witnesses upon whose testimony the fact of the permissive holding by Crosby depended, were not wholly disinterested. In every instance they went to Judge Crosby in behalf of the church. Their sympathies and disposition were in favor of the church, two of them being members thereof, and the other a former pastor. The fact that Judge Crosby made the agreement in 1886 rests upon the recollection of Mr. Foster,

and his versions of that conversation were not in all respects the same. Besides, Judge Crosby was dead and his statement of that transaction was not to be had. To some minds an improbability might be suggested that Crosby would set up claim to a strip of land which he and his wife had made a deed to only four years before, which he would not likely have forgotten that soon; or that a dispute should be entertained by the church about the line concerning which there appears to have been no chance for dispute; also that if the arrangement was then entered into as detailed by the witnesses growing out of a dispute as to title, that so long a time would go by without any mention or agitation of it, by those having charge of the affairs of the church.

The following authorities would hold that in the state of the evidence here, the burden being on plaintiff to show the agreement, appellant had the right to have the jury consider the credibility or bias of the witnesses, and the probability or improbability of the agreement having been made as testified to. (Coats v. Elliott, 23 Texas, 613; Cheatham v. Riddle, 12 Texas, 117; Gonzales v. Adoue, 56 S. W. Rep., 548; Houston, E. & W. T. Ry. v. Runnels, 92 Texas, 307.)

The fourth and fifth assignments refer to the witnesses Foster and Shelton, the point being that they were incompetent to testify to conversations had with Judge Crosby, he having died before the trial, and the said witnesses being members of the plaintiff Presbyterian Church, a religious corporation. The objection is based on the theory that the members of the church corporation are really the owners of the property conveyed to the church, and a judgment for or against the corporation would be conclusive upon them, and they are the real parties. We are of the opinion that the interest of a member of the church was too uncertain and remote to bring them within the statute. In Kentucky, where the statute is substantially the same as ours, stockholders in ordinary corporations are held to be disqualified. Storey v. First Nat'l Bank, 72 S. W. Rep., 318, but this rule was held not to apply to a policy holder in a mutual insurance company, for the reason that the interest must be direct and certain and not remote, uncertain or contingent. (New York Life Ins. Co. v. Johnson's Admr., 72 S. W. Rep., 762.) The statute of California is similar to ours, and it is there held that it does not disqualify stockholders and officers of corporations, discussing cases to the contrary and showing differences in the statutes. (Merriman v. Wickersham, 75 Pac. Rep., 181.) Mr. Greenleaf, vol. 1, sec. 390, says that the true test of the interest of a witness is that he will either gain or lose by the direct legal operation and effect of the judgment, or that the record will be legal evidence for or against him in some other action. It must be a present, certain and vested interest and not an interest uncertain, remote or contingent. Neither of these witnesses, as members of the church, had any vested or certain interest in the property. The property belonged to the corporation. As long as the corporation existed the members had no vested title. In the contingency of a dissolution of the corporation, they might, if then members, become entitled. But their interest at the time of the trial, whatever it was, was remote, uncertain and contingent and not such as to disqualify them as witnesses.

It has been held in this State that the wife of a plaintiff was incom-

petent under ·the statute where the property sued for was community of himself and wife. (Simpson v. Brotherton, 62 Texas, 170.) There the title of the wife was direct, certain and vested.

*Reversed and remanded.*